IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **VIIP, LLC and** | ) | |
| **VICTORIA ISLAMOVA** | ) | **CIVIL ACTION FILE** |
| | ) | |
| Plaintiffs, | ) | NO._____ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **ELVIRA G. MALENKY** | ) | |
| also known as Elvira Medici | ) | |
| and **ELVIRA MALENKY,** | ) | |
| **ATTORNEY AT LAW, LLC d/b/a** | ) | |
| **The Malenky Law Group, LLC** | ) | |
| | | |
| Defendants. | | |

_____

**COMPLAINT FOR LEGAL MALPRACTICE**

COMES NOW, VIIP, LLC and Victoria Islamova, Plaintiffs in the above-styled action, and herein file this their Complaint for Legal Malpractice against Defendants, and show this Court the following:

**The Parties, Jurisdiction, and Venue**

1. Victoria Islamova ("Islamova" or "Plaintiff") is a resident of the State of Georgia, and a Citizen of Country of Russia.

2. VIIP, LLC ("VIIP") is a Georgia Limited Liability Company, which has as its sole member, Victoria Islamova.

3. VIIP is a Citizen of the Country of Russia.

4. Elvira Malenky, also known as Elvira Medici, ("Malenky") is reasonably believed to be a resident of, and now domiciled in, the State of Nevada. Malenky is either a Citizen of the State of Nevada or a Citizen of the State of Georgia.

5. ELVIRA MALENKY, ATTORNEY AT LAW, LLC, ("EMLLC") is an administratively dissolved Georgia Limited Liability Company, believe to have had, as its sole member, Elvira Malenky.

6. EMLLC's last registered office was located at 895 Highland Bend Cove, Alpharetta, Fulton County, Georgia, and the last registered agent was Defendant Malenky.

7. EMLLC is either a Citizen of Nevada or Georgia.

8. Malenky was, at all times relevant hereto, licensed to practice law by the State Bar of Georgia.

9. Malenky operated her law practice through EMLLC, which had its office in Roswell, Georgia.

10. All of the tortious acts alleged herein occurred in Fulton County, Georgia.

11. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a).

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

13. As a result of the allegations set forth herein, this Court has personal jurisdiction over the Defendants.

## General Allegations

14. Plaintiff was educated and trained as an engineer in Russia.

15. Plaintiff had been employed under the umbrella of Gazprom, an oil and gas company that had been created through the privatization of the Soviet Ministry of Gas.

16. Plaintiff worked hard and saved her money, and was looking to invest in a business sometime in 2008. Given her exposure to the oil and gas business, a gas station seemed like it might be a good investment.

17. In early 2009, Plaintiff found Dominant, through the Internet. Dominant is a Russian business that claims to help people like Plaintiff find business investments and assist with immigration related issues.

18. Initially, Plaintiff submitted information to Dominant indicating that she sought to invest about $500,000, and was looking for something in

Bulgaria, where she had a small apartment on the beach.

19. Dominant advised her to consider looking in the United States because of the depressed economy.

20. Dominant had "partners" in Atlanta. These partners were Victor Vaivodiss ("Vaivodiss") and Anatoly Dudko ("Dudko").

21. Vaivodiss and Dudko held themselves out as experts in business consulting, real estate, and management.

22. Dudko was a licensed real estate broker.

23. Plaintiff initially communicated with Vaivodiss, and he and Dudko provided Plaintiff with information about different gas stations in the Atlanta area.

24. Vaivodiss advised Plaintiff that gas stations are very profitable, scarce, and did not stay on the market very long.

25. Vaivodiss told Plaintiff that he and Dudko had a very good business lawyer, Elvira Malenky, and that Malenky would represent Plaintiff's interest in the transaction.

26. Vaivodiss, Dudko, and Malenky shared common office space.

27. By November 2009, Vaivodids and Dudko had effectively fixated on a Shell station located at 5404 Peachtree Industrial Boulevard ("the Shell station").

28. In an e-mail dated December 2, 2009, Vaivodiss confirmed that Elvira would be her lawyer in all aspects of the transaction. A copy of the e-mail, as it was sent, and as translated, is attached hereto as Exhibit "A."

29. On February 19, 2010, Plaintiff executed a Letter of Intent to purchase a Shell gas station. A copy of the LOI is attached hereto as Exhibit "B."

30. In early March 2010, Plaintiff came to Atlanta to look at the Shell station, and some other possibilities. During this March 2010 visit, Plaintiff went to the office of Dudko and Vaivodiss, and was introduced to Defendant Malenky, who would be her lawyer.

31. During the March 2010 trip, Defendant Malenky advised Plaintiff she should create a limited liability company to purchase and operate the business she was going to purchase.

32. Plaintiff returned to Russia, and on or about March 14, 2010, executed a Contract to purchase the Shell station ("the Contract"). A copy of the Contract is attached hereto as Exhibit "C."

33. The Contract to purchase the Shell station allowed forty-five days for Plaintiff to conduct and inspection of the property and books and records.

34. Defendant Malenky was responsible for performing diligence in connection

with the purchase, including but not limited to making sure that VIIP would have title subject to the loan.

35. On April 1, 2010, Vaivodiss e-mailed Plaintiff to inform her that Elvira, "our attorney," has scheduled the closing for April 19th. An original of this e-mail, and a translated copy, are attached hereto as Exhibit "D."

36. On or about April 1 or 2, 2010, upon information and belief, Defendant Malenky, as part of her representation of Islamova, electronically filed the documents necessary for the creation of VIIP, LLC.

37. On April 14, 2010, Dudko e-mailed Plaintiff to inform her that the inspections had been completed, and that Elvira had not found any problems. The original and a translated copy of the e-mail are attached hereto as Exhibit "E."

38. Exhibit "E" contained two attachments, including the results of the title search and a title insurance commitment, a copy of which is attached hereto as Exhibit "F."

39. Exhibit "F" revealed certain matters of record relating to the Property, including the existence of security deeds that were modified several times, including in July 2009 showing the Shell station property was securing two

loans that totaled over $1.6 Million that would mature in July 2011.

40. Plaintiff returned to Atlanta for the closing of the Shell station that was scheduled for May 11, 2010 ("the Closing").

41. The Closing took place at Defendants' office. Present were Plaintiff Victoria Islamova, Defendant Malenky, Thomas Stanford, and Dudko.

42. Defendant Malenky presented a package of documents that were to be executed.

43. The closing documents included a disclosure, a copy of which is attached hereto as Exhibit "G" containing the following:

> Parties acknowledge that The Malenky Law Group, LLC (hereinafter referred to as "Settlement Agent") represents Seller/Purchaser in the sale of the above referenced property.

44. In light of the allegations set forth herein, Plaintiff reasonably believed that Defendant Malenky was acting as her attorney in connection with the Shell station acquisition and transaction.

45. Malenky never said, suggested, informed, or disclosed, in any way, shape or form, that she was not representing Plaintiff.

46. In addition to representing Plaintiff, Exhibit "G" indicates that Malenky represented the Seller, TES Enterprises.

47. Notwithstanding the above allegations, the lender, Community Bank of the South believed that Malenky was representing it at the closing of the Shell station.  See <u>Islamova v. First United Realty, et. al.</u>, US District Court (NDGA) Case No. 1:13-02092-AT ECF No. 5-1 FN2 *(In fact, Malenky, as the closing attorney, represented CBS, as the lender. CBS did not consent to her representing any other party to the transaction*.)

48. At the closing, Defendant Malenky, who speaks both English and Russian, spoke not only in English, but very quickly, and acted as if she were in a hurry.

49. Plaintiff signed the closing package at the places indicated by "sign here" stickers.

50. All of the attorney's fees for the closing were paid from Plaintiff's funds.

51. After closing, Plaintiff continued to contact Defendant Malenky to discuss legal matters, including the status of her immigration application, the transfer of licenses from the Shell station's prior owner to herself, and concerns about the purchase.

52. In May 2011, Defendant Malenky electronically filed the annual registration for VIIP.

## COUNT ONE - NEGLIGENCE

53. Plaintiff incorporates paragraphs 1-52 above as if fully set forth herein.

54. At all times relevant hereto, Plaintiff reasonably believed that Defendant Malenky was her lawyer.

55. At all times relevant hereto, Defendant Malenky and EMLLC owed Plaintiff a duty to exercise that reasonable degree of skill and care, as determined by the degree of skill and care ordinarily employed by their respective professions under similar conditions and like surrounding circumstances.

56. Pursuant to O.C.G.A. §9-11-9.1, Plaintiffs have filed with this Complaint the Affidavit of Leon Van Gelderen, a licensed attorney in the State of Georgia, which is incorporated herein by reference.

### What Actually Happened

57. As of August 2001 TES Properties owed money to Community Bank of the South ("CBOTS"). This loan was secured by the Shell station property, and reflected by a Deed to Secure Debt recorded in Deed Book 12399 Page 44 in the records of the Clerk of Superior Court of Dekalb County ("the 2001 DTSD").

58. TES and CBOTS renewed, extended, and modified the loan from time to

time thereafter.

59. In July 2009 the 2001 DTSD was modified to reflect a then current loan balance of approximately $1.65 Million.  The 2009 Modification can be found in the records of Dekalb County Superior Court at Deed Book 21596 Page 562 ("the 2009 Modification").  A copy of the 2009 DTSD is attached hereto as Exhibit "H."

60. The 2009 Modification reflected the loan balance was due to mature in July 2011.

61. Among the requirements in the title commitment (Exhibit "F") was the satisfaction or cancellation of the 2001 DTSD and all modifications thereof, including the 2009 Modification.

62. On May 11, 2010, TES Properties executed a new note for $930,000, leaving a balance on the original loan of approximately $717,000.

63. The $930,000 loan was co-signed by Plaintiff Islamova, and guaranteed by Plaintiff VIIP, LLC.  A copy of the new loan is attached hereto as Exhibit "I."

64. The 2001 DTSD was modified to reflect the new May 11, 2010 transactions.

65. The 2011 Modification, recorded at Deed Book 21976 Page 523, as

recorded, reflected two loans secured by the Shell station property, which were Loan A for $930,000 loan and Loan B with a balance of $717,447.39.

66. Loan A had a maturity date in 2016 and Loan B, the original loan, had the same July 2011 maturity date reflected in the 2009 Modification.

67. A copy of the 2010 Modification is attached hereto as Exhibit "J."

68. Exhibit "J was a transaction between TES Properties and CBOTS.

69. Defendants never disclosed the 2010 Modification to Plaintiffs.

## The Transaction

70. Plaintiff agreed to purchase the Shell station and real property for $1.45 Million.[1]

71. She basically paid $630,000 in cash to close, and agreed to wrap around financing of the $930,000 loan to finance the purchase.

72. In addition to the $930,000 loan from TES Properties that was co-signed and guaranteed by Plaintiffs to CBOTS, Defendant Malenky also drafted and had Plaintiff VIIP execute an additional $930,000 loan in favor of TES Properties, and an accompanying security deed subordinated to the 2001

---

[1] Vaivodiss had represented to Plaintiff in an e-mail sent on December 2, 2009, that the net profit after paying all expenses for the Shell station was $19,400 per month, which turned out to be a complete fabrication.

DTSD.

## Breach of Duties

### (Conflict of Interest)

73. At all times relevant hereto, Defendant Malenky was well aware that a lawyer is prohibited from representing or continuing to represent a client if there is a significant risk that lawyer's duties to another client will materially and adversely affect the representation of the client.

74. In representing the purchaser (Plaintiffs), seller (TES Properties) and lender (CBOTS) in the Shell station transaction, Defendants was negligent in failing to advise Plaintiff to seek independent counsel with respect to the transaction.

75. Had Defendants advised Plaintiff to bring the Shell station transaction to the attention of independent counsel, a reasonable legal professional would have advised Plaintiff not to go through with the transaction.

### (Competence)

76. Defendants had a duty to competent representation to Plaintiffs.

77. Competent representation means that a lawyer shall not handle a matter which the lawyer knows or should know to be beyond the lawyer's level of

competence without associating another lawyer who the original lawyer reasonably believes to be competent to handle the matter in question. Competence requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

78. In light of the title commitment (Exhibit "F"), Defendant Malenky had knowledge of the outstanding loans and indebtedness, and a competent lawyer would have advised Plaintiffs not to close on the Shell station transaction because the property, even after closing, was securing $717,000 in loans that were due in July 2011.

79. In light of the history of the loan modifications made that reflected a near 100% increase in the outstanding balance from 2001 to 2009, an attorney exercising ordinary care should have inquired as to the cause in order to determine how to properly advise the client as to whether or not to proceed.

80. In light of the near doubling of the loan balance, the separation in connection with the transaction of the $1.65 Million loan into two loans where over $717,000 remained unpaid and due in just fourteen (14) months, an attorney exercising ordinary care should have inquired as to whether Plaintiff should have proceeded with the transaction.

(Candor)

81. In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. A lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client.

82. In addition to the issue of the remaining loan identified hereinabove, an attorney exercising ordinary care would have recognized that the sales price combined with the structure of the transaction, was likely to be the result of fraud or deceit, and Defendant Malenky had a duty to so advise the Plaintiffs.

(Failure to Advise on the Status of the Title)

83. Defendants failed to exercise the ordinary care, skill and diligence of a legal professional in failing to advise Plaintiffs that, even if the transaction is closed, and the $930,000 loan was paid off in fourteen months, the Shell station would still be subject to the 2001 DTSD as modified by the 2011 Modification.

84. Defendants failed to include the existence of the pre-existing loan, or that the purported new loan with the CBOTS remained.  This is evidenced by the

HUD-1 settlement statement Defendants prepared for the closing that contains no entry on lines 203 and 503 of the statement. A copy of the HUD-1 is attached hereto as Exhibit "K."

| | | | |
|---|---|---|---|
| 120. GROSS AMOUNT DUE FROM BORROWER | 1,478,248.00 | 420. GROSS AMOUNT DUE TO SELLER | 1,450,000.00 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | |
| 201. Deposit or earnest money | 26,000.00 | 501. Excess Deposit (see instructions) | |
| 202. New Loan and Note | 930,000.00 | 502. Settlement charges to seller (line 1400) | 120,240.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage lien | 42,993.19 |
| | | SUNTRUST BANK | |

85. As a result of the negligence of Defendants Malenky and EMLLC, Plaintiff completed the transaction to purchase the Shell station.

86. Had Defendant Malenky and EMLLC exercised ordinary care, Plaintiff would not have closed on the Shell station.

87. Because Plaintiffs closed on the Shell station, VIIP acquired a business that obviously was not able to support the loan used to purchase it.

88. As a result of Defendants' negligence, Plaintiffs have lost at least the $630,000 paid in cash at closing.

### COUNT TWO - ATTORNEY'S FEES

89. Plaintiffs incorporates the allegations set forth in paragraphs 1-85 above as if fully restated herein.

90. Defendants have acted in bad faith, have been stubbornly litigious, and have

caused Plaintiff unnecessary trouble and expense.

91. As a result of the allegations set forth above, Plaintiffs are entitled to recover attorney's fees and expenses of litigation

WHEREFORE, Plaintiffs pray for a judgment in their favor for all actual and compensatory damages, jointly and severally against the Defendants as appropriate, and to recover attorney's fees and expenses of litigation, and punitive damages, and such other and further relief deemed necessary and just.

This the 27th day of February, 2014.

/s/ Ryan Isenberg
Ryan L. Isenberg
Attorney for Plaintiffs
Georgia Bar No. 384899

Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
770-351-4400 (Voice)
678-990-7737 (Fax)
ryan@isenberg-hewitt.com